**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**

**v.**                                                    **Case 2:18-cr-20162-JTF**

**JAMES MACKLIN,**

                    **Defendant.**

---

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant James Macklin's Motion to Suppress. (Docket Entry ("D.E.") #19). The instant motion was referred to the United States Magistrate Judge for Report and Recommendation. On October 24, 2018, the Magistrate Judge held an evidentiary hearing on the instant motion. For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

### I.    Introduction

On August 27, 2018, Defendant filed his Motion to Suppress asserting that the Memphis Police Department officers had neither probable cause nor reasonable suspicion to stop his vehicle on the date in question. Specifically, Defendant argues that he legally stopped at the intersection and did not violate any traffic ordinances. Thus, Defendant contends that the stop constituted an unlawful seizure requiring suppression of all evidence found thereafter.

1

On September 10, 2018, the Government responded that it believes the evidence will show that Defendant disregarded a stop sign by "rolling stop" and that the ensuing traffic stop was appropriate. Thus, the Government asserts that all evidence was obtained as a result of a lawful stop and should not be suppressed.

At the October 24, 2018 evidentiary hearing, three witnesses testified as to the events of the traffic stop and the circumstances surrounding the in-car video recording: Officer Madison Capps testified on behalf of the Government, and Officer Tayt Matheny and Officer Edward Cash testified on behalf of the Defense. Various exhibits, including body camera footage, in-car video footage, photographs, and other documents were also introduced by the Government and the Defense as discussed below.

## II.    Proposed Findings of Fact

At approximately 1:00 a.m. on September 29, 2017, Officer Madison Capps and Officer Tayt Matheny of the Memphis Police Department were on patrol heading southbound on Montgomery in Memphis, Tennessee. (October 24, 2018 Hearing Transcript ("Tr.") at 6:5-8, 6:18-20, 7:20-22, 12:3-6, 16:9-16). Officer Capps had recently graduated from the police academy on August 10, 2017, had been a patrol officer for approximately a "month and a few days," and was still within her initial "eighty days" on the force. (Tr. at 6:1-13, 6:24-25, 19:13-17). Officer Matheny was acting as Officer Capp's field training officer. (Tr. at 6:23-24, 7:6-11). Officer Capps was driving Officer Matheny's squad car, and Officer Matheny was the passenger. (Tr. at 7:9-19, 12:7-9). Officer Capps had performed other traffic stops but was nonetheless very new to the force. (Tr. at 6:11-17). Officer Capps had tested her body camera

and in-car camera before the beginning of her shift as required, and the "test video" from the in-car camera did properly record and remained preserved.  (Tr. at 24:15-25:16, 36:11-21).

As Officer Capps and Officer Matheny were approaching the intersection of Montgomery and Keel, Officer Capps observed a black Dodge Charger heading eastbound on Keel make a right turn onto Montgomery without coming to a complete stop.  (Tr. at 6:25-7:4, 7:23-8:15, 12:10-16:8, 20:16-24:10 & Exh. 1).  Officer Capps informed Officer Matheny that she planned to initiate a traffic stop.  (Tr. at 7:4-5, 8:16-22, 23:19-22).  Although Officer Matheny did not observe the traffic offense, as he was not looking in that direction at that time, Officer Matheny gave her the "go-ahead" to initiate the stop, and Officer Capps activated her "blue lights" to do so.  (Tr. at 7:4-5, 8:16-22, 19:5-20:15).

Officer Capps explains that there are several options she had to choose from in activating the squad car lights:

> We had our equipment box in the console of the car.  One click turns on the rear lights.  Two clicks turns on the rear and front lights and activates the body camera, the in-car camera.  And a third click will activate the front, back lights, and the sirens, and activate the cameras.

(Tr. at 8:25-9:6, 25:19-26:2, 34:11-19).  Regardless of how the body and in-car cameras are activated, they begin recording thirty seconds before the activation.  (Tr. at 26:5-11, 24:18-19).  Officer Capps testified that she "hit two notches," at which time her "body camera initiated, the in-car camera initiated, and [the Defendant] attempted to stop, and he stopped."  (Tr. at 9:7-10, 9:14-20, 34:25-34:2, 36:21-23).  Officer Capps testified that it is audible on her body camera recording that she activates the blue lights, body camera, and dash camera.  (Tr. at 27:2-7).  Officer Capps testified that she only goes to "three clicks and turn[s] on the sirens if someone doesn't see . . .  [the] blue lights just to get their attention."  (Tr. at 9:11-15).  Officer Capps

3

testified that, while she and Officer Matheny were stepping out of the vehicle, Defendant pulled up further in his vehicle as if he might be about to flee, but he then again came to a full stop at Montgomery and Jackson.  (Tr. at 17:23-19:4, 27:20-34:7 & Exh. 2).

Officer Capps testified that, after Defendant stopped his vehicle, she got on the radio and advised dispatch of their location at Jackson and Montgomery and of the vehicle's tag number. (Tr. at 9:20-24).  Officer Capps testified that she and Officer Matheny then exited their vehicle to approach Defendant's vehicle.  (Tr. at 10:1-2).  Officer Capps testified that it was pretty dark at that time of the morning but the area was "fairly lighted."  (Tr. at 16:19-17:22, 40:23-24 & Exh. 2).  Specifically, Officer Capps testified that Defendant's headlights were on and that there were various street lamps lighting the area that had assisted in allowing her to observe the traffic infraction.  (Tr. at 40:19-41:20).

Upon approaching Defendant's vehicle, Officer Capps came into contact with Defendant, informed him that she had stopped him for his failure to make a complete stop, and asked for his license and insurance information.  (Tr. at 10:4-8).  Defendant advised that he did not have any identification on his person because he was driving his girlfriend's car.  (Tr. at 10:9-11). Defendant began looking for his girlfriend's insurance information but, because Officer Capps was uncertain of who she was "dealing with" absent no identification, she asked him to step outside the vehicle for their safety.  (Tr. at 10:13-17, Exh. 7 at 0:02:13-0:02:30).  Ultimately, when Officer Capps attempted to pat down Defendant, he ran from the officers.  (Tr. at Exh. 7, 0:02:21-0:03:15).  Defendant was apprehended after a chase on foot, at which time a firearm was found on his person.  (Tr. at Exh. 7, 0:03:13-0:04:58).

Officer Capps testified that, for reasons unknown, there is no in-car video recording of the traffic stop. (Tr. at 34:20-25, 37:1-4). Officer Capps testified that this is the case even though you can tell from her body camera that, when she activated the blue lights, you could see the in-car camera activate on the screen and hear that it "beeps in a different way than the body worn camera, so it was activated." (Tr. at 35:3-6, 35:13-22). Officer Capps believes that there must have been a "technical issue," including that it was possibly "miscategorized." (Tr. at 35:8-12, 37:8-40:5). Officer Capps testified that she did not do anything to interfere with the in-car video recording. (Tr. at 37:5-7).

Officer Matheny testified that, on September 29, 2017, he was on uniform patrol acting as Officer Capps' field training officer. (Tr. at 43:14-23). Officer Matheny had served with the Memphis Police Department for eight years and was present in the vehicle when Officer Capps initiated the traffic stop of Defendant. (Tr. at 43:9-13, 43:24-44:1). Officer Matheny testified that he "[v]aguely" recalled the incident wherein Officer Capps observed Defendant roll through a stop sign. (Tr. at 44:2-7). Officer Matheny described the area as "dark with street lamps." (Tr. at 44:24-45:2). Officer Matheny testified that he did not observe the traffic offense himself because he was "looking away at that time." (Tr. at 44:8-11). However, Officer Capps informed him that "she was about to stop a vehicle in front of us because it didn't come to a complete stop." (Tr. at 44:12-14). Officer Capps then "observed the vehicle traveling south on Montgomery," and they initiated a traffic stop. (Tr. at 44:15-16).

Officer Matheny testified that, before the shift began, they did a test video of the in-car camera, they made sure that their lights and sirens functioned, and they made sure that the in-car video and body camera automatically activated with the lights and sirens. (Tr. at 45:5-14).

5

Officer Matheny testified that, as far as he knew, the in-car video was functioning on that day. (Tr. at 45:15-19). Officer Matheny testified that the in-car video "popped up" that day, which indicating to him that it was functioning. (Tr. at 45:20-25).

Officer Cash testified that he serves the Memphis Police Department as a video analyst manager at the Real Time Crime Center, which is the "information systems hub" where body camera and in-car camera footage is stored. (Tr. at 47:9-24). Officer Cash has served in this role for approximately two years. (Tr. at 47:25-48:2). Officer Cash explained that the in-car video system is supposed to record "out of the front windshield of the vehicle" as well as in the backseat. (Tr. at 48:10-16).

Officer Cash testified that the Memphis Police Department has in effect policies and procedures for use of the body cameras and in-car cameras. (Tr. at 48:25-50:24 & Exh. 3). Officer Cash stated that the policies require that the officers perform test videos at the beginning of their shifts and that the officers activate the videos at pertinent times, including when they perform a traffic stop. (Tr. at 50:25-51:22). Officer Cash stated that, at the end of each shift, officers are to park their car "in a designated area at the precinct, and they are supposed to log out of the laptop rather than shut it down," which will "allow the video to upload continuously for about two to four hours." (Tr. at 52:1-5). If officers at the Real Time Crime Center need to "get into the database," they are able to access it. (Tr. at 52:6-7).

Officer Cash testified that video recordings can be classified by a variety of methods, including a "computer-aided dispatch number" or "CAD," which is a unique number assigned to a specific incident, such as a traffic stop. (Tr. at 53:19-54:25). In-car video recordings may also be located by searching for the "P numbers" of the vehicle. (Tr. at 55:1-3). Officer at the Real

Time Crime Center also review dispatch records to make certain that they have located all video associated with a certain incident. (Tr. at 55:4-5).

Officer Cash testified that he provided "all the video we had" to the prosecution and to the defense as well as a spreadsheet that summarized the recordings. (Tr. at 52:11-53:14, 55:10-16, 57:3-9, 60:12-63:13 & Exh. 4).[1] Officer Cash testified that there is no video available between the times of 1:06 a.m. and 2:05 a.m. for the traffic stop of Defendant. (Tr. at 58:12-59:11). He testified that the in-car video from Officer Capps and Officer Matheny's car was not *deleted* but was *cancelled*, which he explains as follows:

> There is a feature in the in-car video system where if you activate the blue lights there is an automatic trigger for the camera to begin recording both front and backseat. However, if you were to deactivate that recording manually within ten seconds, I believe, or if you were to turn the lights back off within a matter of seconds, then it would cancel the recording.

> So deleted videos actually show up as deleted. Whereas, if it's canceled, it will say media canceled or recording canceled, but it will never appear as a video in anything other than a log saying that there was media created but it was canceled.

> If the user canceled it, it will tell you that the user canceled it. But if it says that it just ended, the official response from the vendor would be that the lights were flicked back off in a short enough time span to cancel the recording.

(Tr. at 59:16-60:11). Officer Cash further explained that videos are only *deleted* due to retention policies. (Tr. at 63:14-65:8, 68:9-10). Officer Cash clarified that he did perform a search to confirm that a canceled video existed for this traffic stop, which he testified that it did. (Tr. at 68:20-69:19). Officer Cash testified that the canceled video was begun and then canceled by turning on and then turning off the blue lights. (Tr. at 69:7-19). Officer Cash did not locate any deleted video in regards to the traffic stop of Defendant. (Tr. at 69:20-70:3).

---

[1] Officer Cash testified that the only difference between the video recordings provided to the prosecution and to the defense would be that the defense versions would be redacted. (Tr. at 67:13-19).

When asked if he had an explanation for the missing in-car video recording in this case, Officer Cash further testified as follows:

> If you were to—the blue lights activated at position two will trigger recording from both front and backseat camera. However, if you were to stop the blue lights by putting it back at the idle position, then it would cancel it as long as it's within a certain amount of time. Ten seconds is usually the reference by the vendor. Also, if you were to manually stop a recording within ten seconds, then it will cancel the recording. . . . Both would have to be done by the officer in the car . . .

(Tr. at 65:9-66:1). Officer Cash further confirmed with the vendor that, on this particular occasion, the officer would have had to have "turned off the lights," which "would have cancelled the recording." (Tr. at 66:4-13). Officer Cash testified that turning off the blue lights, which stops the recording, is in violation of Memphis Police Department policies and procedures. (Tr. at 66:14-20).

The Memphis Police Department Policy and Procedures on In-Car Video ("ICV") / Body Worn Cameras ("BWC") was also introduced as an exhibit to the hearing. (Tr. at Exh. 3). The MPD Policy and Procedure states, in pertinent part, as follows:

**B. Use of ICV During the Shift**

**1.** An officer shall at all times during his/her shift have their ICV system ready to record police interactions with those they may encounter. . . .

**2.** Officer shall activate their ICV system when responding to all calls for service prior to making the scene of a dispatched call. In the event that recording was not started prior to making the scene of a dispatched call, an officer will activate the device as soon as reasonably possible. Additionally, officers will begin recording specials prior to initiating any citizen contact or as soon as reasonably possible.

**3.** Officers shall record all law-enforcement encounters and activities. Calls for service, self-initiated events (specials), and confrontations while not engaged in police activity are to be documented via ICV where available. It is not necessary for an officer to record in a constant state, but is required when his/her duties are being performed and allowed when otherwise prudent. It should be understood

8

that under no circumstance shall an officer's safety be compromised in an effort
to record an event.

. . . .

6. **Once a recording event begins, the ICV shall remain activated until the
event has concluded in order to conserve the integrity of the recording.** Once
the event has concluded, an officer will mark the conclusion of the recording
verbally after clearing the call/special. In cases of arrest, an officer shall continue
recording until custody is transferred.

. . . .

**7.** Officers will document the fact that an ICV record was or was not captured on
all incident reports, arrest tickets, misdemeanor citations, summons, and traffic
citations. This documentation will be referenced by the Computer Aided
Dispatch number written on/in the document. In the event that the ICV was not
activated, terminated early, or otherwise interrupted, a supervisor will be
immediately notified.

**8.** Officers will be permitted to review their own ICV video when preparing
official documents. Officers may only view content on their assigned device and
not those devices of other department members when preparing an official
document. The supervisor **must** also review the ICV video prior to completing or
approving official reports involving response to resistance/use of force. The
viewing will be utilized as a tool when completing written reports to ensure the
accuracy and consistency of events. The availability of this review does not
supersede policy directives governing the circumstances in which an event must
be recorded. An officer may not simply stop recording in order to complete a
report unless policy permits. . . .

(Tr. at Exh. 3, 5-8) (emphasis in original).

The existing body camera videos and in-car videos were also introduced into evidence at

the hearing. (Tr. at Collective Exhibit 5 (redacted) and Exhibit 7 (unredacted)). Officer Capps'

body camera footage contains no audio for the first thirty seconds, but when the audio begins,

five beeps can be heard. (Tr. at Coll. Exh. 5, Disc 5, at 0:00:30-0:00:35). You can also clearly

see the dash video screen is showing live video footage of Defendant's vehicle as he comes to a

stop. (Tr. at 0:00:35-0:00:41). The video of Defendant's vehicle on the dash camera remains on

the screen even as Officer Capps is exiting her vehicle. (Tr. at 0:00:47-0:00:48). Officer Capps

is also heard asking Defendant, "did you not see that stop sign back there?" (Tr. at 0:01:54-

0:01:56). When Defendant responds, "I stopped," Officer Capps rebuts that, "you rolled it" and

"didn't stop completely." (Tr. at 0:01:56-0:02:02).

     Officer Matheny's body camera video contains no audio for the initial twenty-nine

seconds, but when the audio begins, the blue lights activate and four beeps can be heard. (Tr. at

Exh. 7 at 0:00:29-0:00:40). Officer Matheny's body camera video also shows the stop sign

where Defendant ultimately stopped his vehicle and his red tail lights. (Tr. at 0:00:40). As

Officer Matheny exits the vehicle, it appears that only the vehicle's rear lights are activated. (Tr.

at Exh. 7 at 0:00:51-0:00:54, 0:06:25-0:06:26, 0:19:27-0:19:35, 0:59:47-1:06:52). The contrast

with vehicles whose front and rear lights are both activated can be seen by observing other cars

on the scene. (Tr. at Exh. 7 at 0:04:36). Officer Matheny is also seen attempting to review the

video of the stop and discussing the lack of video with other officers. (Tr. at Exh. 7 at 0:54:26-

1:00:44).

    **III.    Proposed Analysis**

     The Supreme Court has held that stopping an automobile and detaining its occupants

constitutes a seizure within the meaning of the Fourth Amendment. *United States v. Hill*, 195

F.3d 258, 263-64 (6th Cir. 1999) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The

Sixth Circuit has stated that, "so long as the officer has probable cause to believe a traffic

violation has occurred or was occurring, the resulting stop is not unlawful." *United States v.

Draper*, 22 Fed.Appx. 413,414 (6th Cir. 2001) (citing *United States v. Ferguson*, 8 F.3d 385, 391

(6th Cir. 1993)); *see also United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012); *United*

*States v. Stanford*, 476 F.3d 391, 395-96 (6th Cir. 2007). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "It requires only a probability or substantial chance" that the unlawful conduct occurred, "not an actual showing of such activity." *Smith*, 182 F.3d at 477 (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n13 (1983)). "Although the proponent of a motion to suppress generally bears the burden of establishing her or her Fourth Amendment rights were violated by a challenged search or seizure, it is the government's burden to demonstrate by a preponderance of the evidence that a particular seizure was based on either probable cause or reasonable suspicion." *United States v. Spaulding*, 446 F. Supp. 2d 789, 795-96 (N.D. Ohio Aug. 23, 2006) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Baldwin*, 114 Fed. Appx. 675, 681 (6th Cir. 2004); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)).

Here, Defendant argues that Officer Capps lacked probable cause to effectuate the traffic stop of his vehicle. The evidence of the traffic infraction is simple and unrefuted—that Officer Capps observed Defendant "roll" rather than coming to a complete stop at a stop sign. However, the question presented is whether the Government has met its burden of establishing probable cause when there is no in-car video of the stop.

The Court RECOMMENDS that the Government has met its burden for several reasons. First, the Court had the opportunity to witness both Officer Capps and Officer Matheny's demeanor at the evidentiary hearing. The Court finds Officer Capps' testimony regarding the traffic offense to be very clear, quite consistent, and very credible, especially given her short

11

time on the force. Officer Capps testified that she was able to see the traffic offense at that time

of day due to the street lighting, which is bolstered by the body camera footage showing the

lighting around the area of the traffic stop. Officer Capps' body camera footage also clearly

shows her asking Defendant whether he saw the stop sign and explaining to him that he rolled

through the stop sign and did not completely stop.

      The Court also finds Officer Matheny's testimony that he did not see the traffic offense

also to be credible and consistent with his body camera footage both before and after the stop.

The Court found it to be very believable that he was simply looking in a different direction and

did not see the offense when it happened. The Court also finds that Officer Matheny's testimony

that he saw the video of the traffic stop "pop up" on the in-car video, leading him to believe it

was recording, to be corroborated by Officer Capps' body camera footage that shows the same.

The Court finds that Officer Matheny's body camera footage also clearly shows him attempting

to retrieve the in-car video as he finished the paperwork for Defendant's arrest and being

frustrated that he was unable to do so. Finally, the Court finds that Officer Cash's testimony that

the in-car video was somehow cancelled to be consistent with the body camera footage showing

that Officer Capps and Officer Matheny's squad car only had its rear lights on. The Court finds

Officer Capps to be entirely credible that she did not intentionally cancel the recording.

      Further, Defendant argues that Officer Capps' failure to properly record in-car video of

the offense violates Memphis Police Department Policy and Procedures. The Court agrees that

the failure to record in-car video is in violation of the express policies. However, this does not

necessitate a different recommendation for several reasons. First, the Court finds that the

Government has established that probable cause existed for the traffic stop regardless of the lack

of in-car video.  Second, the Fourth Amendment requires reasonableness, not perfection, and allows for "some mistakes on the part of government officials."  *See Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014) (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).  Here, the Court recommends that Officer Capps and Officer Matheny reasonably attempted to obtain all possible recordings by pushing the buttons twice to do so.  Somehow, it appears that Officer Capps hit the button instead to de-activate the front lights, which cancelled the in-car video recording.  Yet, the Court does not find that her actions were less than reasonable in attempting to effectuate the traffic stop.   Thus, the Court RECOMMENDS that probable cause existed to effectuate the traffic stop and that the lack of in-car video due to a reasonable mistake does not violate the Fourth Amendment.

## IV.    Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.


Signed this 5th day of November, 2018.


s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**